UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


JENNY S. [1]

Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

Defendant.
_____

Case No. 1:18-cv-01503-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

Plaintiff Jenny S. ("Plaintiff") filed this action under section 205(g) of the Social Security

Act (the "Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the Commissioner

of Social Security (the "Commissioner") who denied her applications for social security disability

insurance benefits ("DIB") and supplemental security income ("SSI") (collectively "Benefits").

_____
[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of
the non-governmental party in this case.

The court finds the fibromyalgia diagnosis did not meet the requisite criteria, and the ALJ's discounting of Plaintiff's testimony and the limitations identified by her treating provider was supported by substantial evidence and not in error. Accordingly, the Commissioner's final decision is affirmed.

## Procedural Background

On or about September 17, 2014, Plaintiff filed applications for Benefits alleging an onset date of September 1, 2013. The applications were denied initially, on reconsideration, and by Barry Robinson, the Administrative Law Judge (the "ALJ"), after a hearing. The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

## Factual Background

Plaintiff is forty-three years old. She graduated from high school and completed some college courses. Her past relevant work experience includes child-care worker and general office clerk. Plaintiff has not been involved in a successful work attempt since June 2009. She originally alleged disability because of degenerative disc disease, posterior disc osteophyte complex, severe right and moderate left foraminal narrowing, TMJ arthritis, and insulin resistance and later added lumbar and knee osteoarthritis, lumbar stenosis, S1 radiculopathy, lumbosacral neuritis, lumbar bone spurs, degenerative pubic symphysis, fever of unknown origin, and fibromyalgia. Plaintiff last met the insured status requirements entitling her to DIB on December 31, 2014.

I. Testimony

At the time she filed for Benefits, Plaintiff lived with her husband (who was also applying for disability benefits based on pancreatic stones, chronic pancreatitis, and dumping syndrome), mother, two young children, and a dog. (Tr. of Social Security Administrative R., ECF No. 15

("Admin. R."), at 54, 251, 400.) Plaintiff complained of daily "moderate, severe, and excruciating" back pain, along with numbness, pain, and tingling in her legs, due to degenerative disc disease, bone spurs, and left neural foraminal narrowing at L5-S1. (Admin. R. at 251.) Plaintiff worked as a "secretary" until mid-2009 when she suffered an "emotional breakdown" and was terminated. (Admin. R. at 43.) Plaintiff unsuccessfully[2] searched for other employment until February 2011, when she gave birth to her first daughter and ceased seeking employment. (Admin. R. at 45.)

In a Function Report Plaintiff completed on November 12, 2014, she described her daily activities as follows:

> Usually wake up, go to bathroom, drink coffee, try to get room tidied, which I have to take frequent breaks and tends to take all day. As well as caring for my 2 daughters (with the help of my husband). Daughters are age 2½ and 3½ years old. Try to take shower on a daily basis. Take frequent rests. Try to get through each day. Try to go to sleep around 12:30 a.m. And usually takes a couple of hours to fall asleep.

(Admin. R. at 252.) She reported she was able to spend thirty minutes to an hour preparing meals for her family, but often reverted to frozen dinners due to pain. (Admin. R. at 253.) She did laundry, with assistance from her husband carrying the loads, and washed the dishes about four times a week. (Admin. R. at 254.) Her mother helped with the rest of the housework and yardwork. (Admin. R. at 254.)

Plaintiff drove a car, shopped for food and toiletries two-to-three times a month using the shopping cart for support most of the time, and occasionally took her daughters to the park for

---

[2] Plaintiff did find short-term employment as a seasonal worker for Harry & David in December 2009. (Admin. R. at 45.)

brief periods. (Admin. R. at 254.) She could manage her personal care but sometimes needed help putting on underwear and pants and needed reminders to take her medications. (Admin. R. at 253.) It hurt to take a shower and shave her legs, and she had occasional incontinence. (Admin. R. at 253.) Plaintiff visited friends and family, and attended church twice a year, but was constantly irritable and angered easily as a result of her pain. (Admin. R. at 255-56.) She had difficulty sleeping, tossed and turned all night trying to find a comfortable position, and suffered from radiating pain, numbness, and burning "spots" in both legs. (Admin. R. at 252.)

Plaintiff reported she was unable to lift more than a gallon of water, bend, squat, stand, reach, sit, walk, kneel, or climb stairs without pain. (Admin. R. at 256.) She occasionally tried to walk about half a mile but was in pain the whole time. (Admin. R. at 256.) She was easily distracted, could pay attention for only five minutes, frequently forgot, and did not handle stress well. (Admin. R. at 256.) Prior to her back issues, Plaintiff did housework and yardwork; rode horses and "quads"; hiked; and attended church regularly. (Admin. R. at 252.)

In early 2015, Plaintiff reported additional limitations as of October 2014, which included "lumbar and knee osteoarthritis, lumbar stenosis, S1 radiculopathy, lumbosacral neuritis, lumbar bone spurs, degenerative pubic symphysis, fever of unknown origin, and fibromyalgia" to her claim. (Admin. R. at 273.) Plaintiff indicated she was unable to walk due to pain in her back and knees, had recently fallen when her knees "gave out," and needed to use a cane to climb stairs. (Admin. R. at 273-74.) She also stated she was unable to stand or sit for long periods of time, frequently needed to lie down and nap, had pain with exercise, and was unable to lift anything. (Admin. R. at 274, 77.) She subsequently reported that in June 2015, her knee and back pain

worsened dramatically, she wore a knee brace at night to get some relief from her pain, and she had to use knee braces and a cane to walk long distances. (Admin. R. at 283, 286.)

At the May 22, 2017 hearing, Plaintiff testified she lived in a fifth-wheel trailer with her disabled husband and her two children, ages five and six. (Admin. R. at 43.) She was normally at a pain level of six or seven and was able to reduce her pain by reclining, which took a "little bit of the pressure off." (Admin. R. at 56.) Plaintiff said she needed to lie down three-to-seven times a day for twenty minutes to two hours. (Admin. R. at 56.) She suffered from low-grade fevers one to five days a week that resulted in extreme fatigue, but the cause of the fevers remained undiagnosed. (Admin. R. at 57-58.) Plaintiff identified Sarah Roberson, F.N.P. ("Roberson"), as a medical professional who understands Plaintiff's overall problems "very" well and provided referrals to assist Plaintiff in obtaining a diagnosis. (Admin. R. at 52-53.)

Plaintiff stated she was able to do light housework, such as wash dishes, cook, clean, and do laundry, but regularly needed to sit or lie down due to pain and was "sometimes" unable to get everything done. (Admin. R. at 51, 54.) Her husband assisted with the housework "a little bit." (Admin. R. at 54.) Plaintiff homeschooled her children for short periods totaling an hour a day because it was easier than having to get up and take them to school due to her fatigue and back issues. (Admin. R. at 43, 51.) She drove only once or twice a week as driving resulted in back pain and sciatic pain on her right side. (Admin. R. at 54.)

Plaintiff reported she was unable to lift and carry more than five pounds and, as a result, had to give up lifting and carrying her children once they were able to walk. (Admin. R. at 54-55.) She was able to sit for twenty or thirty minutes before needing to stand but was constantly adjusting to alleviate the pain. (Admin. R. at 55.) Similarly, she was unable to stand more than

twenty minutes without sitting.  (Admin. R. at 55.)  She could walk a block or two but used a cane for balance issues, back pain, and support.  (Admin. R. at 55.)  Plaintiff was 5' 6'' and weighed three-hundred pounds but did not believe her weight created any problem with bending over, moving, or otherwise functioning as she has been heavy all of her life and had only recently experienced back pain.  (Admin. R. at 55, 59.)

## II.  Medical Evidence

Plaintiff initiated treatment with Rachel Orozco, M.D., on March 14, 2013, complaining of asthma and allergies.  (Admin. R. at 327.)  Plaintiff informed Dr. Orozco she had a history of fibromyalgia but discontinued prescribed medications due to negative side effects.  (Admin. R. at 327.)  Additionally, Plaintiff complained of severe tailbone pain which persisted after physical therapy the previous year, but denied exercise intolerance, leg numbness or weakness, or bowel/bladder incontinence.  (Admin. R. at 328.)  An x-ray revealed normal alignment of the sacrum and coccyx, no fractures or sublaxations, intact sacral neural foramina, and symmetric sacroiliac joints.  (Admin. R. at 339.)  Dr. Orozco noted as normal Plaintiff's ambulation, motor strength and tone, extremity movement, gait and station, and memory, and Plaintiff appeared active and alert with normal mood and effect and good judgment.  (Admin. R. at 328.)  Dr. Orozco included morbid obesity, disorders of the coccyx, and fibromyalgia in a list of Plaintiff's problems, the latter two apparently based solely on Plaintiff's reports.  (Admin. R. at 326.)  A stress test performed on April 4, 2013, revealed Plaintiff was able to exercise for slightly more than six minutes and stopped due to shortness of breath, which was characterized as "moderately below-average exercise capacity for both age and gender."  (Admin. R. at 332-33.)

In the fall of 2013, Plaintiff sought additional care from Dr. Orozco on various occasions because she was "just not feeling good," had been running a mild fever for several months, and was suffering from fatigue, lethargy, hair loss, frequent urination, water retention, nausea, and decreased appetite, as well as occasional diarrhea and ear, throat, and abdominal pain. (Admin. R. at 316, 322, 324-25.) During this period, Plaintiff denied exercise intolerance and Dr. Orozco consistently reported Plaintiff's ambulation, motor strength and tone, extremity movement, and gait and station were normal. (Admin. R. at 316, 319, 322, 325.) Numerous lab tests ordered by Dr. Orozco and performed between August 6, 2013, and September 16, 2013, were inconclusive and failed to reveal a possible cause for Plaintiff's complaints. (Admin. R. 351-64.)

In December 2013, Plaintiff began treatment with Roberson for intermittent fevers suffered during the prior year, fatigue over the previous five years, muscle aches, headaches, and difficulty sleeping. (Admin. R. at 413.) Plaintiff complained of joint pain and swelling, muscle pain, arthritis, weakness, and memory loss. (Admin. R. at 413.) Plaintiff informed Roberson she had been diagnosed with fibromyalgia and brain cysts in 2011 after the birth of her first child. (Admin. R. at 413.) On examination, Roberson found Plaintiff to have a stable, balanced gait, normal posture and range of movement in her upper and lower extremities, no major joint swelling or redness, and no gross abnormalities. (Admin. R. at 414.) Roberson ordered a variety of labs seeking to identify the cause for Plaintiff's fever and fatigue and evaluate a possible connection between Plaintiff's fibromyalgia and adrenal fatigue. (Admin. R. at 415.) The lab tests revealed slightly low Vitamin D and HDL levels, high levels of insulin, glucose and TG, and normal levels of LDL, AM cortisol, TSH, and free T3 and T4. (Admin. R. at 410.)

On December 30, 2013, Plaintiff clarified her fevers generally run below 100 degrees, occur in the evening two-to-three times a week, and resolve during the night. (Admin. R. at 410.) Roberson prescribed Metformin to treat Plaintiff's insulin resistance and opined Plaintiff's fatigue could be related to a diseased gall bladder, fibromyalgia, or the fevers. (Admin. R. at 407, 409, 412.) Over the next four months, Roberson or one of her associates referred Plaintiff to an infectious disease specialist, an endocrinologist, and an ENT, and ordered an ultrasound of Plaintiff's head, neck, and thyroid to evaluate for a tonsillar abscess. (Admin. R. at 403, 404, 407, 409.) The CT imaging revealed "scattered cervical lymph nodes but no lymphadenopathy or mass" but failed to rule out a parathyroid adenoma. (Admin. R. at 424.)

On May 8, 2014, Plaintiff returned to Roberson with complaints of nightly fevers of about ninety-nine degrees, with body pains, fatigue, and feeling sick throughout the day and worsening at night. (Admin. R. at 400.) Plaintiff reported she was under increased stress due to her husband's disability and a need to move into her mother's house. (Admin. R. at 400.) Plaintiff requested "paperwork" from Roberson recommending Plaintiff not work to aid Plaintiff in obtaining temporary cash assistance. (Admin. R. at 400.) Despite Plaintiff's representations she was suffering from joint pains and weakness, Roberson found Plaintiff's gait to be stable and balanced, and her posture and range of motion normal with no gross abnormalities or joint swelling or redness. (Admin. R. at 401.) Roberson directed Plaintiff to continue with her Metformin, reviewed Plaintiff's vitamins, encouraged her to engage in healthy eating and be as active as possible, and ordered a chest x-ray in addition to the CT scan ordered by the ENT. (Admin. R. at 402.)

Plaintiff's primary complaints to Roberson on June 19, 2014, were "severe hip and pelvic/back pain all the time that she works through on a daily basis" with the assistance of a Norco

prescription that helps her sleep when the pain is excessive. (Admin. R. at 396.) Plaintiff reported her stress was making her back and hip pain worse, and she was experiencing bad spasms in her right neck and back. (Admin. R. at 396.) Chiropractic treatment alleviated some of her issues, but she was unable to afford to continue such care. (Admin. R. at 396.) Roberson observed tenderness and tightness in Plaintiff's right upper shoulder and to the neck area of the trapezius, tenderness in her general lower back, and a palpable strip of spasm in the middle of her back on the right side. (Admin. R. at 397.) She refilled Plaintiff's Norco prescription and prescribed a muscle relaxant for her strained muscle as well as generalized joint aches and pains. (Admin. R. at 398.)

On July 22, 2014, Roberson prescribed a commode "for use at bedside during intermittent flares of severe pelvic pain and lumbar muscle spasms" and bladder urgency. (Admin. R. at 389, 394.) Later that month, Roberson opined Plaintiff's fatigue, abdominal pain, back pain, and weakness could be caused by a Candida infection. (Admin. R. at 389.) Plaintiff reported she had previously been diagnosed with this condition but failed to follow the prescribed protocol. (Admin. R. at 389, 425.) Roberson placed Plaintiff on a restricted diet, and prescribed Diflucan. (Admin. R. at 384-87.) Plaintiff reported a slight improvement in her symptoms, particularly her fatigue, when she strictly followed the Candida cleanse diet and used her medication, but noted finances prevented her from doing this consistently. (Admin. R. at 371, 373, 381.)

In late August 2014, Patrick R. Hungerford, M.D. diagnosed Plaintiff with mild hyperparathyroidism, confirming the possible parathyroid adenoma noted in the CT imaging, but did not believe "that most, if any, of her many symptoms noted above have any relationship to her parathyroid/calcium disorder and as such, I would not expect her to necessarily see any of them resolve after surgery." (Admin. R. at 422, 429.) The symptoms Dr. Hungerford referred to were

identified as "fever-like symptoms for the past 1.5 years" and "chronic back pain, numbness along neck and arms, ankle pain, chest pain, hair loss, [and] nausea." (Admin. R. at 419.) X-rays taken on September 5, 2014, revealed "moderate degenerative changes at L5-S1 with a posterior disc osteophyte complex caused severe right and moderate left neural foraminal narrowing." (Admin. R. at 308.)

On September 30, 2014, Plaintiff reported pain in her right knee and ankle, continuing pain in her lumber spine radiating into her legs, and weakness which "is sometimes overwhelming and intolerable" causing Plaintiff to apply for Benefits. (Admin. R. at 384.) Roberson observed Plaintiff's gait to be stable and balanced and described her posture movements as "stiff and cautious," but found no gross abnormalities or major joint swelling or redness, and a normal range of movement of her upper and lower extremities. (Admin. R. at 384.) Roberson refilled Plaintiff's Norco prescription, cautioned her about overuse of the medication, and ordered an MRI of her lumbar spine. (Admin. R. at 387.)

A month later, Plaintiff indicated she had a tight and sore neck with pain and numbness radiating into her arms, wrists, and hands resulting in difficulty handling and opening items. (Admin. R. at 377.) She also described hip pain and instability in her pelvis and related her chiropractor and physical therapist told her she had a "very unstable hip/pelvis." (Admin. R. at 377.) She reported the weakness and pain in her back, hip, and legs nearly prevented her from walking on occasion, and her right leg was weaker and more painful. (Admin. R. at 377.) Upon examination, Roberson noted: "Gait stable and balanced. Slow cautious movements. Weakness against resistance to bilat LE. Could minimally raise legs in a SLR against resistance – Strength

2-3/5 bilat LE. Sitting: Knee raise against resistance 3/5. Normal heel-toe walk. Can squat but back up only with push up support on chair. Tenderness to moderate to deep palpation reported at 10/10 to sacrum, lower lumber, but less to upper lumbar although pain still 5/10." (Admin. R. at 379.) Roberson opined the hip pain was "likely secondary to a hypermobility syndrome, fibromyalgia, obesity, and some degeneration." (Admin. R. at 379.) As of December 3, 2014, Roberson again observed Plaintiff's gait to be stable and balanced, her posture and range of motion normal with no gross abnormalities, and no joint swelling or redness. (Admin. R. at 373.)

In early 2015, Jeffrey A. Solomon, D. O., examined Plaintiff at the request of Roberson for evaluation of Plaintiff's reports of long-standing pain in her back, soreness in her neck, and radiating pain, numbness, and tingling in her extremities, particularly in her right leg. (Admin. R. at 439.) Plaintiff reported the symptoms were especially severe at night and prevented her from walking more than a quarter of a mile, and that she had fibromyalgia. (Admin. R. at 439, 441.) Dr. Solomon's examination notes provided:

> Neck and back are inspected. No abnormal deformities. ROM is present. Negative seated straight leg raising test. I did not perform tender point examination since she has fibromyalgia.

> The upper limbs show full ROM of shoulder, elbows, wrists and hands. Negative tinsels and phalens at wrists. Normal tone and reflexes in both upper limbs. Full muscle bulk, power, sensation, and dexterity.

> Lower limbs: No visible or palpatory abnormalities. Full muscle bulk and power, tone and reflexes. Patellar and achilles reflex 2+ and symmetric. No clonus or pathologic reflexes.

> She reports diminished sensation in the feet, especially the lateral aspect, bilaterally.

Gait is neurologically normal.

Straight leg raising test done in supine position is negative.

Full hip and knee ROM.

(Admin. R. at 441.)

Dr. Solomon diagnosed Plaintiff with very mild bilateral carpal tunnel syndrome, hints of early diabetic polyneuropathy, and right S1 radiculopathy due to neuroforaminal stenosis but did not believe there was severe nerve damage based on her normal and symmetric S1 reflexes. (Admin. R. at 441.)   He recommended injections combined with physical therapy, finding conservative treatment rather than surgery to be preferable.  (Admin. R. at 441-42.)  He also noted Plaintiff had underlying chronic pain, fibromyalgia, and morbid obesity.  (Admin. R. at 441.)

Plaintiff returned to Roberson on February 5, 2015, to follow-up on Dr. Solomon's testing and with seemingly new reports of foot pain, reporting she felt like she was walking on stones. (Admin. R. at 441.)  Roberson noted Plaintiff had antalgic posture with a wide stance to her gait, tenderness over her right hip and SI joint, and slightly edematous wrists but otherwise no visible or palpable abnormalities.  (Admin. R. at 463.)  Roberson suspected rheumatoid arthritis could be causing Plaintiff's joint pain and fevers and referred her to a rheumatologist.  (Admin. R. at 463.)

On February 10, 2015, reviewing physician, Susan E. Moner, M.D., determined Plaintiff suffered from spine disorders, other arthropathies, diabetes mellitus, and parathyroid gland issues but found Plaintiff capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing, walking, and/or sitting for six hours in an eight-hour workday; climbing ramps and stairs and balancing frequently; and climbing ladders/ropes/scaffolds, stooping, kneeling, crouching and crawling occasionally; but should avoid concentrated exposure to

machinery and heights.  (Admin. R. at 73-75.)  Based on these limitations, which qualified Plaintiff

for "light" work, Dr. Moner found Plaintiff not disabled through December 31, 2014.  (Admin. R.

at 66, 76-77.)

On February 15, 2015, Roberson authored a letter seeking to excuse, or delay, Plaintiff's

jury duty obligations.  (Admin. R. at 599.)  In the letter, Roberson stated:

> To Whom It May Concern:
>
> [PLAINTIFF] is a patient in the Ventana Wellness practice.  I see her on a regular
> basis and work with her as her primary care provider.  She is currently struggling
> with multiple medical issues that are in the process of being worked up.  Her
> medical issues are such that she cannot tolerate sitting or standing for any extended
> period of time.  Please allow her to defer Jury duty for at least the next twelve
> months, although this may be an indefinite request.

(Admin. R. at 599.)

On March 11, 2015, Plaintiff reported increased knee pain that, on one occasion, was so

sudden and severe she fell back on the couch, blurry vision, increased headaches, numbness to her

face, vertigo, and continued limb and joint pain, fevers, and extreme fatigue.  (Admin. R. at 455.)

Roberson described Plaintiff's movements as cautious and stiff with limited range of motion in

her lumbar spine and hips.  (Admin. R. at 457.)  Roberson considered early stages of multiple

sclerosis as the cause of Plaintiff's symptoms, but thought such a diagnosis would be questionable,

and referred Plaintiff for an MRI of her brain.  (Admin. R. at 441.)  The MRI revealed no acute

intracranial abnormality.  (Admin. R. at 471.)  In a March 25, 2015 letter addressed "To Whom It

May Concern," Roberson explained:

> [Plaintiff] has been under my care for the last one year.  She presented after negative
> work ups to explain her symptoms and condition from other providers.  In this time
> I have referred her to multiple specialist[s] and she continues to have a myriad of
> symptoms that are significantly debilitating causing severe fatigue, severe pain,

paresthesias, fevers, etc. The symptoms are debilitating essentially on a daily basis and at this time, she is not fit for work. At this point it is unclear when or if she will be able to re-enter the work force due to the nature of her illness.

(Admin. R. at 480.)

Plaintiff complained to Roberson on April 22, 2015, of feeling nauseous every time she ate and of severe abdominal pains. (Admin. R. at 645.) Roberson suspected gallbladder issues but noted previous evaluations had eliminated this as a likelihood. (Admin. R. at 645.) Plaintiff reported no joint pain or swelling, muscle pain, or arthritis, and explained her neuropathy improved with Neurontin but she was unable to increase the dosage due to side effects. (Admin. R. at 647-48.) Roberson noted Plaintiff's gait was stable and balanced with normal posture and range of movement in the upper and lower extremities and no gross abnormalities, major joint swelling or redness, or peripheral edema but Plaintiff exhibited moderate to mild tenderness in her abdomen. (Admin. R. at 647.) In early May, 2015, Plaintiff sought treatment on two occasions from an emergency provider for severe abdominal pain. (Admin. R. at 639.) An ultrasound was "fairly negative" and Plaintiff was diagnosed with and treated for a urinary tract infection. (Admin. R. at 639.) A provider in Roberson's office referred Plaintiff to a gastroenterologist/general surgeon for a consult on a possible cholecystectomy. (Admin. R. at 642, 644.) Martin A. Kehrli, M.D., reviewed Plaintiff medical records and, on May 6, 2015, concurred in Dr. Moner's December 2014 assessment, finding Plaintiff capable of light work and not disabled. (Admin. R. at 91, 99-103.)

Plaintiff returned to Roberson on May 14, 2015, with continued complaints of abdominal and shooting flank pain. (Admin. R. at 639.) Roberson started Plaintiff on probiotics, treated the pain with Tylenol and Ibuprofen, and subsequently prescribed weekly vitamin B12 shots. (Admin. R. at 638-39.) At that time, Plaintiff reported muscle pain but no joint pain, joint swelling or

arthritis, and Roberson observed Plaintiff was moving cautiously but her gait remained stable and balanced with normal posture and range of movement in the upper and lower extremities and no gross abnormalities, major joint swelling or redness, or peripheral edema.  (Admin. R. at 641.)

Plaintiff met with Roberson on June 2, 2015, to "discuss and compete disability [paperwork.]"  (Admin. R. at 634.)  In the "History of Present Illness" section of her treatment notes, which generally consisted of Plaintiff's reports, Roberson wrote:

> Disability sought due to her severe ongoing unresolving back and leg pain with paresthesias and symptoms of radiculopathy secondary to lumbar disc degeneration, neural foraminal narrowing.  Also progressing neuropathy and paresthesias.  Fibromyalgia sxs of chronic body pain and fatigue.  Pubis symphysis pain. Weakness, N/T, burning pain to extremities.  These symptoms are temporarily relieved with rest.  Must have frequent position changes.  Cannot sit/stand longer than 20min typically, frequent shifting even during this time.

(Admin. R. at 634.)  Plaintiff also reported the surgeon recommended removal of her gallbladder, but she was having difficulty getting insurance coverage due to her normal gallbladder scans.[3] (Admin. R. at 634.)  In a list of Plaintiff's symptoms, Roberson included joint pain, joint stiffness, muscle pain, physical disability, arthritis, body inflammation, knee pain, numbness, parasthesias, weakness, and tingling.  (Admin. R. at 636.)  Upon examination, Roberson reported Plaintiff was slow to sit and stand and engaged in frequent shifting and position changes.  (Admin. R. at 636.) Finally, in her assessment, Roberson summarized Plaintiff's conditions and limitations in pertinent part as follows:

---

[3] An associate in Roberson's office ordered a scan of Plaintiff's gallbladder on June 4, 2015, and referred Plaintiff to a gastroenterologist on July 14, 2015.  (Admin. R. at 631-32.)  Plaintiff subsequently reported to Roberson she had her gallbladder surgically removed.  (Admin. R. at 620.)

Lumbar DDD - moderate to severe daily pain. Radiation. Limiting in mobility, causing weakness. Disability ppwk completed for this and below issues.

Pelvic pain - secondary to pubis symphysis degeneration as noted on MRI pelvis. Painful sitting/standing, repositioning.

Neuropathy - unclear full etiology. Remain on gabapentin. Problematic due to burning, N/T, pain. Difficulty hanging on to objects, grasping at times, etc.

Chronic Cholecystitis - highly symptomatic for this. Apparently gen surgery possibly appealing denial. Will follow.

(Admin. R. at 636.)

In a comprehensive report completed the same date, Roberson indicated Plaintiff suffered from neuropathy, neural foraminal stenosis of lumbar spine, degenerative lumbar discs, fibromyalgia, pelvic joint pain, multiple joint pains, and an "elevated sed rate" which she considered to be supported by CT scans and an MRI of Plaintiff's pelvis and reportedly resulted in daily constant pain at a level of eight or nine on a scale of ten. (Admin. R. at 474, 477.) Roberson stated she was treating these conditions with Gabapentin, Tylenol, and Ibuprofen, as well as Norco and Cyclobenzaprine as needed, and rated Plaintiff's prognosis as "fair." (Admin. R. at 475.) Roberson considered Plaintiff's credibility with regard to pain to be "good." (Admin. R. at 478.)

In the comprehensive report, Roberson opined Plaintiff could stand for no more than twenty minutes, sit for no more than twenty-to-thirty minutes with constant shifting, walk no more than half a block using a supportive device, needed to lie down occasionally during the day to relieve pressure to her pelvis and back, and required the ability to change positions frequently. (Admin. R. at 475-74, 478.) According to Roberson, Plaintiff could reach above the shoulders and down to the waist consistently, handle items with her fingers frequently, and rarely reach down to

the floor or handle objects carefully but was unable to lift more than five pounds and frequently dropped things. (Admin. R. at 476-77.) Roberson explained Plaintiff had difficulty tolerating bending and kneeling, minimal difficulty squatting, and minimal difficulty turning parts of her body (provided such movements were slow), but could travel alone, if necessary. (Admin. R. at 477.) Roberson identified severe functional fatigue and debilitating weakness as other factors making it difficult for Plaintiff to tolerate activity and did not believe Plaintiff could perform work requiring consistent attention or interaction with others. (Admin. R. at 477.) Roberson stated Plaintiff was unable to return to her prior employment and did not know if Plaintiff could engage in any other work but suspected not. (Admin. R. at 478.)

On August 12, 2015, Plaintiff returned to Roberson with excruciating lumbar pain that appeared gradually after Plaintiff did the dishes and swept and mopped the floor and lasted for two days. (Admin. R. at 627.) Plaintiff also reported unstable hips, back and pubic joints, indicating she felt as though they were right on the edge of dislocation. (Admin. R. at 627.) Roberson noted Plaintiff had significant difficulty with sit-to-stand, her gait was antalgic and stable only with the use of a cane, was severely limited in her forward flexion from the waist and extremely limited bilaterally in her knee to chest raise, and a tender back with deep palpation at L4-5/S1. (Admin. R. at 629.) Roberson ordered an x-ray of the lumbar spine, noting she did not find a previous x-ray in Plaintiff's records, provided a Toradol injection, prescribed MS Contin, and referred Plaintiff to an orthopedist. (Admin. R. at 629.) Plaintiff returned on August 14, 2015, with a migraine headache, and received Toradol and Phenergan. (Admin. R. at 624-26.)

Plaintiff had various complaints on September 29, 2015, primarily a sore throat and fever, with increased joint pain, fatigue, and abdominal pain. (Admin. R. at 620.) Roberson found

Plaintiff's gait to be stable and balanced with normal posture, no gross abnormalities or major joint swelling or redness, normal range of motion in her upper and lower extremities, and no peripheral edema. (Admin. R. at 622.) Roberson noted Plaintiff "appears better than she has in months," and "is moving with more agility and appears more energized, which is not consistent with her verbalization of symptoms." (Admin. R. at 622.) Roberson thought Plaintiff was suffering from a viral illness and instructed Plaintiff on immunological support through supplements, healthy eating, anti-inflammatory diet, rest, and hydration. (Admin. R. at 623.)

Jay Burrup, PA-C ("Burrup") of Southern Oregon Orthopedics, examined Plaintiff at Roberson's request on October 9, 2015. (Admin. R. at 662.) Plaintiff described her complaints to Burrup as constant low back, hip, and leg pain at a level of seven out of ten which made it difficult to sit. (Admin. R. at 662.) On examination, Burrup observed tenderness at the "midline L/S low" and both sacral sulci and greater trochanters, pain with hip flexion, and decreased sensation in right leg. (Admin. R. at 663.) Burrup thought SI injections may be appropriate in the future and ordered an MRI to evaluate Plaintiff's spinal nerves. (Admin. R. at 663.)

On October 29, 2015, Plaintiff reported she was diagnosed with GERD, her fevers continued, and she was forced to discontinue Gabapentin due to side-effects, such as right flank pain due to shingles.[4] (Admin. R. at 611.) Plaintiff requested Norco as a substitute for Gabapentin and Roberson wrote the prescription, noting Plaintiff "has found Norco helpful in the past both for her inflammatory symptoms as well as somewhat for her neurological symptoms interestingly. I do believe she is not abusing historically and has a definite need for this. She is a mother of young

---

[4] However, it appears an associate in Roberson's office prescribed Gabapentin for Plaintiff on November 24, 2015. (Admin. R. at 603.)

children.  Her husband is on disability.  She needs to be able to move around etc.  She is very limited at this time."  (Admin. R. at 611, 614.)  Roberson observed Plaintiff had limited lumbar spine range of motion on examination.  (Admin. R. at 613.)  An MRI completed on November 10, 2015, revealed "L5-S1 with broad based posterior disc protrusion and disc osteophyte complexes extending into the foramina bilaterally causing moderate stenosis in the exit zones.  There is also mild focal cephalad extension with mild compression of the right ventral caudal sac."  (Admin. R. at 602.)

In a report dated December 12, 2015, which is apparently an update following Plaintiff's MRI, Andy Kranenburg, M.D. indicated the MRI shows severe degenerative disc disease with inflammatory collapse and foraminal stenosis bilaterally at L5/S1.  (Admin. R. at 649.)  Dr. Kranenburg noted Plaintiff reported pain scores of eight on a scale of ten in her back and legs and observed her gait was antalgic with a limp and erect posture, a positive SLR on the right, and tenderness with palpation at the lumbosacral junction.  (Admin. R. at 649.)  Dr. Kranenburg discussed treatment options – injections or surgery – but cautioned surgery may not resolve the buttock and leg pain and was made more difficult by her diabetes, neuropathy, obesity, and smoking.  (Admin. R. at 649.)

In March 2016, Plaintiff established care with Margaret Bismark, F.N.P. ("Bismark"), when her previous provider, presumably Roberson, required Plaintiff to participate in counseling before providing additional referrals.  (Admin. R. at 578.)  Plaintiff did not view as necessary counseling for depression related to her chronic pain and ongoing stress.  (Admin. R. at 581.)  Plaintiff sought a referral to a cardiologist based on an abnormality in an EKG which she believed was evidence of a heart attack, occasional chest pains, and a family history of cardiac disease.

(Admin. R. at 578.)  Plaintiff reported abdominal pain, back pain, neck pain, dizziness, recurring fevers, headaches, nausea, numbness, shortness of breath, weakness, hearing loss, rhinorrhea, sinus pressure, and tinnitus.  (Admin. R. at 578.)  Plaintiff also complained of neurological changes and speech difficulty and expressed a desire for a referral to a neurologist.  (Admin. R. at 579.) Bismark indicated Plaintiff's neck was supple with normal range of motion, and there was "[n]o point tenderness to the lumbar spine.  Straight leg raise negative bilaterally.  Heel raises without weakness.  Does walk with a cane." (Admin. R. at 582.)  Bismark ordered an echocardiogram that occurred on April 14, 2016, and revealed normal left ventricular function, no significant valvular disease, and mild concentric left ventricular hypertrophy with normal diastolic function.  (Admin. R. at 507-09.)

Plaintiff returned to Bismark for a follow-up appointment on May 9, 2016.  (Admin. R. at 570.)  Upon examination, Bismark observed Plaintiff had normal range of motion and reflexes with no tenderness, despite Plaintiff's reports of arthralgias, a gait problem, and a need to use a cane due to hip and knee problems.  (Admin. R. at 572.)  Bismark continued Plaintiff's prescriptions, specifically the Metformin, vitamin D, and hormones, recommended an increase in foods high in folic acid and continuation of existing activities and stretching, and suggested Plaintiff seek diet and exercise assistance from the YMCA to aid in pain management.  (Admin. R. at 576.)

On June 30, 2016, David A. Chamberlain, M.D. provided a rheumatology consult with Plaintiff at the request of Bismark about joint pain and fever.  (Admin. R. at 493.)  Plaintiff reported suffering from joint pain for more than twenty years, particularly in her wrists, elbows, shoulders, cervical and lumbar spine, hips, knees, ankles, and feet.  (Admin. R. at 493.)  Upon examination,

Dr. Chamberlain observed no clubbing, cyanosis, or edema of the extremities, normal radial, dorsalis pedis pulses, no synovitis of the extremities, and normal bulk, strength, and tone of the upper and lower extremity muscles. (Admin. R. at 495.) Dr. Chamberlain opined Plaintiff's joint pain may be a combination of osteoarthritis and overlying neuropathic pain. (Admin. R. at 496.) He concurred with the previous recommendation for injections and physical therapy, suggested bracing for hand pain, recommended weight loss, and ordered x-rays of Plaintiff's right hip and lab testing. (Admin. R. at 496.) X-rays of Plaintiff's right hip and pelvis taken on June 30, 2016, were considered normal. (Admin. R. at 501.)

On August 4, 2016, Plaintiff sought assistance from Bismark for her diabetes, complaining of blurred vision, fatigue, and weakness. (Admin. R. at 563.) Plaintiff also reported having a sore throat for the previous ten days and pain and numbness in her hands. (Admin. R. at 563.) Bismark noted Dr. Chamberlain reported testing for Sjogren's was negative and there was no evidence of rheumatoid arthritis. (Admin. R. at 565.) Bismark referred Plaintiff to an ENT for her sore throat and tonsil stones and to physiatry for her carpal tunnel syndrome, recommended Plaintiff wear braces and/or wrist splints, and suggested counseling to deal with her chronic pain. (Admin. R. at 568-69.) Ten days later, Plaintiff returned to Bismark with flank pain, pain with urination, and a fever. (Admin. R. at 550.) A urine culture was negative, and Plaintiff was directed to complete her Cephalexin prescription and add foods high in magnesium to her diet. (Admin. R. at 555.) Plaintiff subsequently sought emergency treatment for her abdominal pain on August 16, 2018, and again two days later. (Admin. R. at 510-25, 664-87.) CT scans of Plaintiff's pelvis, dated August 16 and 18, 2016, were negative for any acute abnormality. (Admin. R. at 503-06.) An August 18, 2016 x-ray of Plaintiff's chest revealed no acute cardiopulmonary disease. (Admin. R.

at 502.)  Plaintiff received intravenous doses of medications, including morphine, while in the facility and elected to return home with antibiotics and a laxative on both occasions, despite the possibility of undiscovered appendicitis.  (Admin. R. at 516, 524.)

Plaintiff returned for a second assessment of nerve pain in her hands and wrists with Dr. Solomon on September 14, 2016.  (Admin. R. at 481.)  Plaintiff reported body-wide pain, a stiff and painful neck and mid- and low-back, and pain in her arms, thighs, calves, and trunk.  (Admin. R. at 481.)  Dr. Solomon noted she had insulin resistance, a diagnosis of fibromyalgia, a possible auto-immune disorder, such as Sjogren's syndrome, symptoms of irritable bowel syndrome, and was morbidly obese.  (Admin. R. at 481.)  Solomon's report of his examination, assessment, and discussion provided:

> This is a 40 year-old morbidly obese female, she is alert, pleasant, and cooperative.
>
> Face is symmetric, speech is clear, cranial nerves intact and symmetric.
>
> Neck supple, no deformity.  She has diffuse cervical paraspinal tenderness but normal cervical spine ROM and negative Spurling's test.
>
> The thoracolumbar spines are visualized and palpated.  She has widespread tenderness pretty much everywhere I palpate but no deformities and the spine seems to move normally.
>
> Strait leg raising test is negative for any radicular signs.
>
> Shoulders show full muscle bulk and power, intact active and passive ROM.
>
> The arms and forearms also with full muscle bulk and power. No swelling of elbow. Negative Tinels at elbows and wrists.
>
> The wrists themselves are unremarkable with normal flex, ex, radial and ulnar deviation.  No effusions or restrictions.  There are no areas of tendon thickening or swelling at the dorsal or volar wrist, palm, or forearms.  No thumb extensor or wrist

extensor tenderness. No crepitation. The hands also show normal ROM of all finger joints. The median and ulnarinnervated hand muscles are with full bulk and power. Sensory exam is non-focal, she describes reduced or altered light touch sensation in all finger tips of both hands. Otherwise sensation is full.

Tone is normal. There are no pathologic reflexes in either upper or lower limbs. Tendon reflexes are 2+ in bilateral biceps, triceps, brachioradialis, patellar and achilles tendons.

Normal pulses in wrists.

Electrodiagnostic studies are performed today, these are limited to bilateral upper limb nerve conduction studies. See attached report. The results were well within normal limits.

**Assessment:**

1. Minimal electrodiagnostic evidence of carpal tunnel syndrome and no ulnar or radial neuropathy or any peripheral neuropathy in the upper limbs. Her bilateral nerve conduction studies were quite normal with the exception of very mild median sensory slowing to the thumb when compared with radial sensory conduction to the same finger.

2. She clearly meets diagnostic criteria for fibromyalgia (both the older, more stringent criteria as the well as the newer, "watered down" criteria). This includes widespread tender points in upper and lower limbs and trunk (she was tender everywhere), emotional disturbance, fatigue, and gastrointestinal disturbance. Unclear if she has other inflammatory or autoimmune disorder.

3. Morbid obesity and insulin resistance syndrome, treated with metformin.

**Discussion:**

I explained that she does not have significant carpal tunnel syndrome or evidence of any peripheral neuropathy affecting the upper limbs or wrists. I am unsure as to exactly what is causing her wrist and hand symptoms but my suspicion is that she is having some degree of systemic inflammation. She has insulin resistance syndrome which generally causes high levels of circulating insulin, this in itself can be pro-inflammatory and certainly promotes fat deposition and inhibits fat-burning (she is > 300 lbs). Additionally her degree of pain is very widespread, really from head to toe, and is associated with high degree of emotionality and stated disability,

also consistent with fibromyalgia. Her gastrointestinal and bowel issues are likely quite significant and need to be addressed. It is possible that she has "leaky gut" syndrome or some other issue that is resulting in over-stimulation of the immune system leading to the pain and other issues. There are several ways to address this but one in particular that I believe is worth her exploring is to try to shift her metabolism through the supervised induction of nutritional ketosis - I gave her references for more research and where to find assist with this. We also discussed some simple dietary modifications aimed at improving her insulin resistance and potentially reducing leaky gut. Lastly, I would recommend rheumatology follow up since she seemed to have questions concerning her labs and inflammatory markers. And whether or not she has Sjogren's syndrome or not.

(Admin. R. at 484-85.)

On September 20, 2016, Plaintiff sought treatment from Bismark for increased back and abdominal pain. (Admin. R. at 542.) Plaintiff reported constant severe aching, burning, cramping, shooting, and stabbing pain in her lumbar spine radiating into her hips and left leg with numbness, tingling, and weakness down both legs, and requested a prescription for Toradol and Tramadol and a referral to her mother's neurosurgeon. (Admin. R. at 542-43.) Bismark noted tenderness in Plaintiff's lumbar back region and a positive straight leg response in the left leg at 90 degrees, expressed satisfaction that the nerve studies were negative, and provided the requested prescriptions and referral. (Admin. R. at 545, 548.) Plaintiff's chronic abdominal pain which radiated to her suprapubic region and was accompanied by constipation, diarrhea, and nausea, significantly improved with Kambucha and worsened with antibiotics. (Admin. R. at 542.) Bismark referred Plaintiff to a gastroenterologist to evaluate for possible leaky gut syndrome, suggested Plaintiff eliminate food that cause her symptoms to worsen, directed Plaintiff to follow-up with Dr. Chamberlain about her fibromyalgia, and again recommended counseling. (Admin. R. at 548.) At an October 18, 2016 follow-up visit, Bismark observed Plaintiff had difficulty changing positions and with the straight-leg raise on the right side, and had tenderness on her

suprapubic right lower quadrant.  (Admin. R. at 540.)  Bismark continued Plaintiff's prescriptions and again recommended the YMCA weight loss and diet program to help with "ongoing pains, polyarthralgias and inflammation."  (Admin. R. at 537-38.)

Plaintiff returned to Dr. Chamberlain on September 23, 2016, with complaints of increased joint pain in her hands, elbow, and low back.  (Admin. R. at 489.)  Dr. Chamberlain's observations and recommendations were consistent with those offered by him in June 2016.  (Admin. R. at 489.)

On December 20, 2016, Plaintiff participated in a consultation with Dakota Doke, PA-C ("Doke"), and Timothy Uschold, M.D., providers at Southern Oregon Neurosurgical and Spine Associates, P.C.  (Admin. R. at 653.)  Plaintiff described her symptoms as low-back and right-leg pain that was progressively worsening, currently at a level of seven on a scale of ten; tingling and numbness in her arms, legs, and face; and weakness in her back, legs, and hands; and she reported she was told "she may have fibromyalgia and peripheral neuropathy in the past but does not take medication for these."  (Admin. R. at 653.)  Doke authored the report and indicated Plaintiff was in no acute distress, exhibited diffuse tenderness with palpation, particularly in the lumbar spine, lateral paraspinal musculature and right SI joint, had a normal gait and station, was able to walk in tandem and on heels and toes, had 5/5 strength and no pain or instability in her upper and lower extremities, no notable finding with regard to her reflexes, had a pinprick discrepancy on the arch and lateral aspect of her right foot, and positive SLR on both sides.  (Admin. R. at 658-59.)

/  /  /  /  /

/  /  /  /  /

/  /  /  /  /

/  /  /  /  /

Doke reviewed the November 2016 MRI[5] which, in his opinion, established "[t]he spine is well aligned. Vertebral body height maintained. There is a mild disc bulge at L5-S1 that does not compress the thecal sac or cause nerve root compression. There is mild foraminal narrowing at L5-S1." (Admin. R. at 660.) Doke was unclear if Plaintiff had a component of lumbar radiculopathy due to her other pain symptoms and did not believe she was any associated or focal neurologic deficits. (Admin. R. at 660.) Doke discussed various treatment options and recommended conservative treatment, including nicotine cessation, weight loss, increased physical activity and therapy, psychiatric consultation, ice, heat, NSAIDs, massage, stretching and topical gels. (Admin. R. at 660.) Doke acknowledged physical therapy might be painful at the outset but it should decrease with regular exercise, and assured Plaintiff her spine is biometrically stable and able to support these activities. (Admin. R. at 660.)

In early 2017, Bismark reviewed Doke's report with Plaintiff, who reported the pain in her back and right leg ranged from moderate-to-severe. (Admin. R. at 691.) Plaintiff represented she was trying to ride an exercise bike but suffered joint pains as a result, and was willing to seek help from YMCA for weight loss. (Admin. R. at 691.) Bismark again strongly encouraged Plaintiff to attend counseling. (Admin. R. at 691.)

Plaintiff participated in limited physical therapy in Spring 2017. (Admin. R. at 701-706.) She experienced stomach and hip pain and cramping with exercise, none of which limited her participation, was unable to lie supine due to sacral pain but tolerated a prone position, and her

_____

[5] An MRI report dated November 11, 2016, found obvious bulging with superimposed small central disc protrusion at L5-S1, moderate foraminal narrowing at L5-S1, and was consistent with a November 2015 MRI. (Admin. R. at 688-69.)

seated stability was compromised while moving her right lower extremities. (Admin. R. at 701, 703.) At her May 1, 2017 appointment, Plaintiff reported she had moved into a trailer with her family and was still unpacking, so she was very sore. (Admin. R. at 701.) X-rays of Plaintiff's elbows taken on May 2, 2017 were normal and an MRI taken the same day revealed a stable circumscribed cyst in the right inferior basal ganglia that was consistent with prior MRI's dated April 5, 2011, and April 10, 2015. (Admin. R. at 707-08, 710-11.)

III. Vocational Evidence

Lynn A. Jones, M.S. ("Jones"), a vocational expert, attended the hearing. She testified that an individual of the same age and with the same education and past work experience as Plaintiff capable of performing sedentary work with the additional limitations of occasional climbing of ramps but no climbing of ladders, ropes, or scaffolds; frequent balancing occasional stooping, kneeling, and crouching, but no crawling; but with a need to avoid concentrated exposure to hazardous machinery and unprotected heights could perform the jobs of assembler, table worker, and sorter. (Admin. R. at 61-62.) Jones opined a similar worker who was "off task" for ten to fifteen percent of the workday or would chronically miss work two days per month would not be able to maintain competitive work. (Admin. R. at 62-63.) Similarly, an individual who was limited to standing and walking for less than two hours and sitting for less than six hours in an eight-hour workday, and was unable to lift up to ten pounds, would be unable to perform any job in the national economy. (Admin. R. at 63-64.)

IV. ALJ Decision

The ALJ found Plaintiff suffered from the severe impairments of obesity, degenerative disc disease of the lumbar spine with right leg radiculopathy, and insulin resistance. (Admin. R. at 20.)

He acknowledged Plaintiff's reports of temporomandibular joint arthritis, low-grade fever, and indigestion, but did not consider these ailments severe. (Admin. R. at 20.) The ALJ also addressed Plaintiff's alleged limitations resulting from fibromyalgia, noting an examining physician found Plaintiff met the diagnostic criteria for fibromyalgia. (Admin. R. at 20.) He indicated fibromyalgia was not a listed impairment and Social Security Ruling ("SSR") 12-2p required consideration of the condition under the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia, and the 2010 American College of Rheumatology Preliminary Diagnostic Criteria ("Criteria"), both of which required evidence that other disorders that could cause the symptoms or signs supporting the fibromyalgia diagnosis were considered and excluded. (Admin. R. at 21.) The ALJ specifically found "the evidence does not establish that other disorders that could cause the claimant's reported symptoms of pain were sufficiently excluded, including the claimant's severe degenerative disc disease of the lumbar spine" and, as a result, found "the claimant's alleged fibromyalgia is not a medically determinable impairment." (Admin. R. at 21.) The ALJ found Plaintiff capable of performing sedentary work with the additional limitations of frequent balancing; occasional climbing of ramps and stairs, stooping, kneeling, and crouching; no climbing of ladders, ropes, or scaffolds, or crawling; and avoidance of concentrated exposure to hazardous machinery and unprotected heights. (Admin. R. at 22.)

As a result of her limitation to restricted sedentary work, the ALJ found Plaintiff unable to perform her past relevant light to medium work. (Admin. R. at 27.) However, based on the testimony of Jones, the ALJ found Plaintiff capable of performing the jobs of small products assembler, table worker, and sorter, which he concluded exist in significant numbers in the national

economy. (Admin. R. at 28.) As a result, the ALJ found Plaintiff was not disabled under the Act from September 1, 2013, through July 12, 2017, the date of his decision. (Admin. R. at 28.)

The ALJ found Plaintiff had medically determinable impairments reasonably expected to result in the symptoms identified by Plaintiff, but her testimony describing the intensity or limiting effects of the identified symptoms were not consistent with evidence, medical or otherwise, found in the record "for the reasons explained in this decision." (Admin. R. at 23.) Consequently, the ALJ discounted Plaintiff's testimony on to her ability to work "only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." (Admin. R. at 23.)

Specifically, the ALJ noted despite objective imaging evidence of a severe spine condition, reports of Plaintiff's ability to ambulate generally remained normal, stable, and balanced from August 2013 through June 2016, with irregularities noted in the first half of 2015 which seemed to resolve with an injection in the summer of 2015. (Admin. R. at 24-25.) The ALJ found the objective imaging studies, occasional positive straight-leg-raise test, and occasional irregular gate reasonably supported a finding Plaintiff's back impairment limited her to sedentary work with the postural and environment limitations identified by the ALJ. (Admin. R. at 25.) The ALJ rejected Plaintiff's claims she had to lie down three-to-seven times a day due to fatigue resulting from insulin resistance. (Admin. R. at 25.) The ALJ acknowledged Plaintiff's consistently high insulin and glucose values, as well as the Metformin prescription, were consistent with a diagnosis of insulin resistance during the relevant period, but relied on A1c levels below the threshold for diabetes in August 2013, September 2015, and August 2016, to support his finding Plaintiff's insulin resistance was well-controlled. (Admin. R. at 25.) The ALJ additionally concluded

Plaintiff's testimony she stopped looking for work after the birth of her children, and her described activities of daily living were "not entirely consistent with her testimony of extreme fatigue and pain" or a finding of disability. (Admin. R. at 26.)

The ALJ gave little weight to the Roberson letter excusing Plaintiff from jury duty due to her poor tolerance in sitting and standing, finding it insufficiently specific regarding the time limits on Plaintiff's ability to sit and stand to be of any value. (Admin. R. at 26.) The ALJ similarly discounted Roberson's opinion Plaintiff could not stand longer than twenty minutes or sit more than thirty minutes at a time, lift or carry more than five pounds, or walk more than half a block found in her June 5, 2015 medical source statement. (Admin. R. at 26.) The ALJ explained these limitations were clearly based on Plaintiff's subjective complaints and were inconsistent with Roberson's physical examinations in April and May of 2015 that indicate Plaintiff had "a stable, balanced gait with normal posture, no gross abnormalities or swelling, a normal range of motion in all extremities and no edema." (Admin. R. at 26.)

*Standard of Review*

The Act provides for payment of DIB to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1) (2019). In addition, under the Act, SSI may be available to individuals who are age sixty-five or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a) (2019). The burden of proof to establish a disability rests upon the claimant. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), cert. denied, 519 U.S. 881 (1996) (DIB); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992) (SSI). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A) (2019). An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2) (A) and 1382c(a)(3)(B) (2019).

The Commissioner has established a five-step sequential evaluation process to use for determining whether a person is eligible for either DIB or SSI because he or she is disabled. 20 C.F.R. §§ 404.1520 and 416.920 (2019); *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (DIB); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989) (SSI). First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, Benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, Benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of the specifically listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment

prevents the claimant from performing work which the claimant has performed in the past. If the claimant can perform work which he or she has performed in the past, a finding of "not disabled" is made and Benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy considering his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995) (DIB); *Drouin*, 966 F.2d at 1257 (SSI). The claimant is entitled to Benefits only if he or she is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

When an individual seeks either DIB or SSI because of disability, judicial review of the Commissioner's decision is guided by the same standards. 42 U.S.C. §§ 405(g) and 1383(c)(3). The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g) (2019); *Batson* v. *Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Robbins* v. *Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki* v. *Shalala,* 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins,* 466 F.3d at 882; *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be

upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). In determining a claimant's residual functioning capacity, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §§ 404.1 545(a)(3), 416.945(a)(3); *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). However, the reviewing court must consider the entire record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007).

*Discussion*

Plaintiff asserts the ALJ erred by: 1) failing to identify fibromyalgia as a medically determinable impairment; 2) improperly discounting Plaintiff's testimony regarding her pain and resulting limitations; and 3) improperly rejecting the functional limitations identified by Roberson, Plaintiff's primary care provider. Plaintiff asks the court to credit the testimony improperly rejected by the ALJ and remand this action to the Commissioner for an award of Benefits. The Commissioner contends the ALJ properly considered the evidence presented to him in accordance with the terms of the Act and related regulations, and that his decision should be affirmed.

I.  Fibromyalgia

Plaintiff argues the ALJ erred by failing to recognize fibromyalgia as a medically determinable impairment at step two and by failing to incorporate accompanying limitations into the residual functional capacity.  The Commissioner argues the ALJ's determination complied with SSR 12–2p but, even if the ALJ erred, the error was harmless because no additional limitations would have been added to the residual functional capacity.

A medically determinable impairment of fibromyalgia may be established by meeting one of two sets of criteria, based on evidence from a licensed physician.  SSR 12–2p at *2–*3; *Revels v. Berryhill*, 874 F.3d 648, 656-57 (9th Cir. 2017) (requiring analysis of fibromyalgia diagnosis under SSR 12-2p).  The first set of criteria requires:  1) a history of widespread pain; 2) at least eleven positive bilateral tender points on physical exam; and 3) evidence that other disorders that could have caused the symptoms were ruled out.  *Id.* at *3.  The second set of criteria requires:  1) a history of widespread pain; 2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and 3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.  *Id.*

After a thorough review of the record, the court agrees the available medical evidence does not meet either set of criteria.  While numerous treating and examining physicians and other medical providers referred to fibromyalgia as one of Plaintiff's ailments, the vast majority of these references were included in a medical history and based entirely on reports from Plaintiff of a diagnosis made shortly after Plaintiff's first daughter was born and nearly two years before her

alleged onset of disability. For example, Dr. Orozco noted on March 14, 2013, Plaintiff "has a hx of fibromyalgia but says she had too many side effects from medication so has chosen not to take any." (Admin. R. at 327.) On December 20, 2016, Doke reported Plaintiff "has been told she may have fibromyalgia and peripheral neuropathy in the past but does not take medications for these." (Admin. R. at 653.) Similarly, her initial treating medical provider, Roberson, consistently listed fibromyalgia under past medical history in her treatment records but never attempted to diagnose fibromyalgia.

The only physician to test Plaintiff's tender points or specifically consider a fibromyalgia diagnosis under the criteria was Dr. Solomon. In early January 2015, Dr. Solomon initially indicated Plaintiff had a "history of fibromyalgia" and he "did not perform tender point examination as she has fibromyalgia." (Admin. R. at 439, 441.) During his second consultation on September 14, 2016, Dr. Solomon did conduct a tender-point examination and concluded Plaintiff "clearly meets diagnostic criteria for fibromyalgia (both the older, more stringent criteria as well as the newer 'watered down' criteria). This includes widespread tender points in upper and lower limbs and trunk (she was tender everywhere), emotional disturbance, fatigue, and gastrointestinal disturbance." (Admin. R. at 485.) However, in the same report, Dr. Solomon noted it was "[u]nclear if she has other inflammatory or autoimmune disorder," acknowledged she also suffered from "morbid obesity and insulin resistance syndrome," questioned whether "she had some degree of systemic inflammation" that could be "causing her hand and wrist symptoms," and opined "[i]t is possible that she has 'leaky gut' syndrome or some other issue that is resulting in over-stimulation of the immune system leading to the pain and other issues." (Admin. R. at 485.) Moreover, Roberson noted on January 2, 2014, Plaintiff's fatigue was "likely fibromyalgia related

as well as fever, etc.," and on November 3, 2014, Plaintiff's hip pain was "likely secondary to a hypermobility syndrome, fibromyalgia, obesity, and some degeneration." (Admin. R. at 379, 412.) Not only did Dr. Solomon and Roberson not "rule out" or "exclude" other disorders that might cause Plaintiff's symptoms, they expressly identified other conditions that could be contributing to Plaintiff's symptoms and resulting limitations.

Furthermore, the court is not convinced the ALJ did not incorporate limitations generally caused by fibromyalgia in his residual functional capacity determination. Fibromyalgia is a "rheumatic disease that causes inflammation of the fibrous connective tissue components on muscles, tendons, ligaments, and other tissue" and results in various symptoms, including "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with [the] disease." *Benecke v. Barnhart*, 379 F.3d 587, 589-90 (9th Cir. 2004). The ALJ found Plaintiff suffered from the severe impairments of obesity, degenerative disc disease with right leg radiculopathy, and insulin resistance which could result in chronic pain, tender points, fatigue, stiffness, and sleep issues and included limitations resulting from these symptoms in his residual functional capacity. Consequently, even if he found Plaintiff suffered from medically determinable impairment of fibromyalgia, such finding would not necessarily result in additional limitations not already accommodated for in his residual functional capacity analysis. Accordingly, because the ALJ considered fibromyalgia symptoms and limitations at subsequent steps, any error in failing to include fibromyalgia as a medically determinable impairment at step two was harmless. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

## II. Plaintiff's Testimony

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform two stages of analysis. *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017); 20 C.F.R. § 416.929 (2019). The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). At the second stage, absent affirmative evidence the claimant is malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).

The ALJ must make sufficiently specific findings to permit the reviewing court to conclude the ALJ did not arbitrarily discredit the claimant's testimony. *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). Factors the ALJ may consider when making such credibility determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in testimony. *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2013); *Tommasetti*, 533 F.3d at 1039.

Here, the ALJ found Plaintiff produced objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and did not identify any evidence to establish Plaintiff was malingering. Consequently, the ALJ was required to offer clear and convincing reasons for discounting Plaintiff's testimony regarding her limitations. To meet this standard, "[t]he ALJ must specify what testimony is not credible and

identify the evidence that undermines the claimant's complaints – '[g]eneral findings are insufficient.'" *Burch*, 400 F.3d at 680, (quoting *Lester*, 157 F.3d at 722)); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (*en banc.*) ("[A] reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain.")

At the hearing, Plaintiff testified she was in constant pain, was unable to lift and carry more than five pounds, walk more than a block or two with the use of a cane, sit or stand for more than twenty minutes without changing position, and needed to lay down three to seven times a day for twenty minutes to two hours. The ALJ discounted Plaintiff's description of the severity of pain and limitations resulting from her back impairment based on numerous reports in the medical records Plaintiff was able to ambulate normally, had normal motor strength and tone, full range of motion in all extremities, and intact sensation, and found Plaintiff capable of sedentary work, which involves lifting of no more than ten pounds and requires occasional walking and standing.

The ALJ's reasons are supported by the record. In March, August, and September 2013, Dr. Orozco noted Plaintiff's ambulation, extremity movement, gait, and station were normal and in March 2013, reported Plaintiff was able to exercise for slightly more than six minutes before stopping due to shortness of breath. From December 2013 through May 2015, Roberson consistently described Plaintiff to have a stable and balanced gait and normal posture and range of motion in her upper and lower extremities while additionally noting Plaintiff's movements were stiff and/or cautious in October and November 2014, and March and May 2015, and Plaintiff had

/ / / / /

/ / / / /

/ / / / /

a wide stance and antalgic posture with new foot complaints in February 2015.[6]  In early June 2015, at the time she was preparing her comprehensive report, Roberson noted Plaintiff was slow in moving from the sitting to standing position and required frequent shifting and position changes and in August 2015, after an acute episode, reported Plaintiff had difficulty moving from the sitting and standing positions, an antalgic gait, limited forward flexion and knee chest raise, and tenderness in her back.  However, by September 2015, Roberson observed Plaintiff's gait was again stable and balanced with normal posture and range of motion.  Roberson expressly noted Plaintiff "appears better than she has in months," and was "moving with more agility and appears more energized which is not consistent with her verbalization of symptoms."  In October 2015, Roberson again reported Plaintiff's gait was stable and balanced with normal posture despite limited range of motion in her lumbar spine.  Hungerford found Plaintiff to have normal balance and gait in August 2014, Solomon reported Plaintiff had normal reflexes and gait, full range of motion in her hip and knee, and "full muscle bulk and power, tone and reflexes" in January 2015, and Bismarck commented Plaintiff had no point tenderness, completed heal raises without weakness, and had negative straight leg raises in March 2016, and normal range of motion and reflexes and no tenderness in May 2016.  Finally, except for a positive straight-leg raise bilaterally and a pinprick discrepancy in Plaintiff's right foot, Doke observed virtually no musculoskeletal limitations in December 2016.  This medical evidence is inconsistent with the degree of pain and

---

[6] On November 3, 2014, Roberson entered contradictory musculoskeletal findings, noting normal findings in one set of notes but identifying limitations, such as cautious movements and difficulties raising her legs and knees and rising from a squatting position in another.  (Admin R. 379, 382.)

limitation described by Plaintiff and adequately supports the ALJ's discounting of Plaintiff' testimony.

The ALJ also discounted Plaintiff's testimony on the degree to which she was limited as a result of fatigue resulting from her insulin resistance, finding Plaintiff's reported A1c levels, all of which were below the threshold for a diabetes diagnosis, established the insulin resistance was adequately controlled. The ALJ rejected Plaintiff's testimony she had to lie down three-to-seven times a day due to fatigue and found the limitation to sedentary work adequately addressed any fatigue resulting from Plaintiff's insulin resistance. The ALJ correctly summarized the evidence and properly relied on Plaintiff's relatively "normal" A1c levels to discount her testimony regarding her need to rest extensively during the day.

Finally, the ALJ found Plaintiff's reported activities of daily living and her decision to stop looking for work after she gave birth to her first child were inconsistent with Plaintiff's subjective description of her limitations. The evidence establishes Plaintiff was terminated from her last employment due to an emotional reaction, not her physical limitations. Plaintiff looked for work, and even worked on a seasonal basis on one occasion, until she voluntarily chose to stop looking for employment after the birth of her first child. Consequently, Plaintiff's lack of employment since 2011 was the result of her decision to stay home with her children and does not support her claim she is unable to work during the relevant period.

After she elected not to work, Plaintiff became primarily responsible for care of her children and, at least, partially responsible for the care of her husband and maintenance of their household. At the time she applied for Benefits, Plaintiff represented she was taking care of her two children (both toddlers), cooking meals, doing laundry and dishes, and shopping. She

indicated her husband helped her with the children and carrying the laundry and her mother, with whom she lived at the time, with the rest of the housework and yardwork. By the time of the hearing in 2017, Plaintiff was living in a trailer with her husband and children and was able to wash dishes, cook, clean, and do laundry with a "little bit" of help from her husband. She home-schooled the children to avoid having to take them to school and drove only once or twice a week due to pain. Plaintiff indicated she needed to rest regularly and was "sometimes" unable to get everything done.

Plaintiff's activities of daily living are not consistent with her claims she must lie down three-to-seven times every day for a period between twenty minutes and two hours due to fatigue, is unable to lift or carry more than five pounds, and cannot sit or stand for more than twenty minutes at a time. The ALJ properly relied on Plaintiff's reported daily activities to discount the severity of her impairments. The ALJ offered clear and convincing reasons for discrediting Plaintiff's subjective testimony that were supported by the record. The ALJ did not err in discounting Plaintiff's testimony.

III. Roberson's Functional Limitations

Plaintiff argues the ALJ failed to provide sufficient justification for rejecting Roberson's description of Plaintiff's impairments and limitations. At the time Plaintiff filed her claims, SSR 06-03p defined "acceptable medical sources" as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech pathologists. SSR 06-03p, *available at* 2006 WL 2329939, at *1 (August 9, 2006).[7] Health care providers who are

---

[7] For claims filed on or after March 27, 2017, the Commissioner has rescinded SSR 06-03p, broadened the definition of acceptable medical, and clarified that all medical sources, not just

not "acceptable medical sources," such as nurse practitioners, physician's assistants, licensed clinical social workers or therapists are still considered "medical sources" under the regulations, and the ALJ can use such "other" medical source opinions in determining the "severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work." 20 C.F.R. §§ 404.1513(d), 416.913(d) (effective September 3, 2013, to March 26, 2017).

An ALJ may not reject the competent testimony of "other" medical sources without comment. *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006). To reject the competent testimony of an "other" source, the ALJ must provide germane reasons for doing so. *Molina*, 674 F.3d at 1111. "Further, the reasons 'germane to each witness' must be specific." *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) (citing *Stout*, 454 F.3d at 1054 (explaining "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony")). Examples of germane reasons for discounting evidence from an "other" source include: (1) reliance on properly discounted self-reports, *Lombard v. Colvin*, No. 6:13-cv-530-MC, 2015 WL 1477993, at *3 (D. Or. Mar. 31, 2015); (2) inconsistency with medical evidence, *see Bayliss v. Barnhard*, 427 F.3d 1211, 1218 (9th Cir. 2005); or (3) inconsistency "with the claimant's activities," *Chappelle v.*

---

acceptable medical sources, can provide evidence that will be considered medial opinions. 20 C.F.R. §§ 404.1502, 416.902; 82 Fed. Reg. 5844-01, *available at* 2017 WL 168819, at *5863, *5873 (Jan. 18, 2017); *see also Popa v. Berryhill*, 872 F.3d 901, 907 (9th Cir. 2017) (as amended) (noting that the prior version of the "Social Security regulations provide an outdated view that consider a nurse practitioner as an 'other source'"). Those revisions, however, do not apply in this appeal. *See Michael S. v. Berryhill*, Civ. No. 6:17-cv-01315-MC, 2019 WL 1062368, at *3 (D. Or. March 6, 2019).

.

*Berryhill*, No. 6:16-CV-00444-SB, 2017 WL 2399581, at *9 (D. Or. June 2, 2017) (citations omitted).

The ALJ expressly rejected Roberson's letter request that Plaintiff be excused from jury duty, finding it was general, did not provide specific limitations, and was not supported by physical examinations during the relevant period. Plaintiff does not assert the ALJ's rejection of the jury-duty letter was in error. Rather, Plaintiff's arguments relate solely to the ALJ's rejection of Roberson's June 5, 2015 comprehensive medical report. Consequently, the jury-duty letter is not before the court and need not be addressed. In any event, the jury-duty letter indicated only that Plaintiff "cannot tolerate sitting or standing for any extended period of time," failed to provide sufficient detail with regard to Plaintiff's physical and mental limitations, and was, therefore, of little use. *See Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1222-23 (9th Cir. 2010) (ALJ did not err in rejecting a medical provider's opinion due to a lack of clarity about whether the medical provider actually opined on disabling limitations). The ALJ's conclusion the jury duty letter was entitled to little weight was not in error and must be upheld.[8]

The ALJ also discounted the limitations described in the June 2015 medical source statement believing they reflected Plaintiff's subjective complaints and were inconsistent with physical examinations in April and May of 2015. Roberson's notes from her April and May 2015 physical exams establish Plaintiff's gait was "stable and balanced," her posture and range of movement in her upper and lower extremities were normal, and she had no gross abnormalities or

---

[8] This analysis applies equally to the March 2015 letter, which was not referenced by the ALJ or either party.

major joint swelling or redness.[9]  However, in June 2015, when Plaintiff asked Roberson to provide paperwork to support her disability claim, Roberson observed Plaintiff was slow to and stand and needed frequent shifting and changes in position.  In her June 2015 assessment and plan, Roberson indicated Plaintiff's back issues resulted in limited mobility and weakness, her pelvic issues caused pain with sitting and standing and required repositioning, and her neuropathy made it difficult to grasp and hold objects.  In the June 2015 comprehensive medical report, which was the first and only identification Roberson made of specific physical limitations resulting from Plaintiff's conditions, Roberson reported Plaintiff was unable to stand or sit for more than twenty or thirty minutes and required regular position changes, could walk no more than a half block with a cane and lift no more than five pounds, had to lie down occasionally, and was limited in her ability to bend, kneel, handle objects, maintain concentration, work with others, and tolerate activity.

Roberson's personal observations prior to June 2015 did not indicate Plaintiff was limited in any manner, making the limitations outlined in her June 2015 report unsupported, if not contradicted, by her treatment notes through May 2015.  Accordingly, the ALJ properly discounted Roberson's stated limitations as inconsistent with her previously reported observations.  Furthermore, the ALJ found the inconsistency between Roberson's treatment notes and the limitations described in the June 2015 comprehensive medical report reflected Roberson's reliance on Plaintiff's subjective complaints in identifying Plaintiff's limitations rather than Roberson's personal observations and assessment.  While these inconsistencies could be viewed in a neutral manner, or even in Plaintiff's favor, the ALJ's interpretation of the evidence is also reasonable.

_____

[9] In May 2015, Roberson noted Plaintiff was moving "cautiously".

The courts "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Burch*, 400 F.3d at 680-81 (quoting *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). As discussed above, the ALJ was justified in discrediting Plaintiff's testimony regarding the severity of her limitations, which provides a legitimate ground for discounting Roberson's limitations to the extent they are based on this testimony. The ALJ did not err in rejecting the severe limitations identified by Roberson in the June 2015 comprehensive medical report.

*Conclusion*

The Commissioner's findings on Plaintiff's disabilities, considering the record as a whole, are supported by substantial evidence. The decision of the Commissioner is AFFIRMED.

DATED this 4th day of November, 2019.

    /s/ John V. Acosta
       JOHN V. ACOSTA
    United States Magistrate Judge